Good morning, ladies and gentlemen. It's our privilege to be at Berkeley today. And it's a special privilege for Judge Fischer and I to share the podium here with Judge Noonan. As you know, Judge Noonan is a long-time faculty member of Berkeley. He's a preeminent scholar. I think, is it your 12th book that's just coming out, John? Is that right? And if you don't mind, I'd like to applaud Judge Noonan's contribution to our court. With that, we'll proceed to the first case on the oral argument calendar, which is Botello v. Gammick. Counsel? May it please the Court. My name is Diane Valancourt, and I represent the plaintiff, the appellant, Renee Botello. I'd like to reserve two minutes for rebuttal. This case alleges that Washoe County District Attorney Gammick was seeking convictions in juvenile sexual assault prosecutions by relying on medical testimony from nurses under contract with his office that was discovered by Mr. Botello to be erroneous and incompetent. Detective Botello spoke out about the untrustworthiness of the nurses' testimony, which consistently led to convictions for the DA. And the DA, to punish whistleblower Botello for speaking out, adopted a policy in which he would refuse to allow Botello to testify in any criminal prosecutions. If the district attorney makes a judgment about the credibility of an investigative officer, does the district attorney enjoy any kind of immunity for that decision? Yes, Your Honor, he enjoys sovereign immunity. And if that were all this case were about, we would not be here. He enjoys more than just sovereign immunity. I'm sorry, absolute immunity. Excuse me. What is it that the defendant sheriff and the assistant crossed the line, in your opinion? Okay, well, they crossed the line by going out of their way to interfere with Mr. Botello's job. And they engaged in this conduct during times when no prosecutions were pending or even contemplated. All right, so it's all right for the sheriff to say, I won't prosecute any cases in which Mr. Botello has been involved in the investigation? Yes, that is all right. But to proactively interfere with Mr. Botello's job when there's no investigations pending, to call up his employer and to spread falsehoods about Mr. Botello when there's no investigations pending. Well, there were three situations. First, when Mr. Botello was between jobs. Now, obviously, there were no investigations pending. It's not even known whether the DA knew he was going to be doing investigations. But he called up Mr. Botello's employer and said, don't hire him. They tried to dissuade him. They said he wasn't a team player. Well, but in fact, they did hire him. They happened to hire him before the DA called. What are your damages? Mr. Botello was at the end of several contacts with the employer. Mr. Botello was removed from an investigation at its incipient stage. No, but look at the first thing. They hired him. Yes. Where is the harm then? There was no harm after that first contact. But I believe it's in Hashimoto to call, and I was trying to remember which the case was, to try to prevent a person from being hired. That itself is an adverse action. And I apologize, I don't remember the exact case. But what happened was he was removed as a result of the district attorney's action. He was removed from his patrol job. Doesn't that flow from the decision of the DA, excuse me, of the sheriff, not to prosecute any cases on which Mr. Botello was involved in any way in an investigation? The school district hired Mr. Botello knowing what was going on. Well, that's not my question. My question is if you conceded at the outset, and I'm surprised that you did so readily, but you conceded that the sheriff can take a blanket position that they won't prosecute any cases in which Mr. Botello was involved in the investigation. If that's the case, and the consequence of that is that he's no longer able to function as a police officer because he can't carry out an investigative function in any manner, why aren't you out of court? Because what they did was they meddled with Mr. Botello's employment when the investigation was in its very beginning stages. They did it when they didn't even know he was going to be an investigator. But if the fact is, that's what I'm trying to understand, the nature of your claim here, if the fact is that you say as a matter of law that it's all right for the district attorney or a sheriff in either case to decide that they won't pursue prosecution of any case where the police officer that they don't happen to like for whatever reason is going to be involved in any way, doesn't that negate the ability of that police officer to function in his job? And if so, he's going to wind up being terminated because he can't function. Mr. Botello's employer didn't think so. Mr. Botello's employer kept him on the job. And it was not until the repeated calls from the DA that Mr. Botello's employer was forced to take him off of his investigation and forced to transfer him to a desk job. But isn't that the problem with your case? Because it's not – certainly the initial calls could arguably be considered as a performance of administrative function rather than a prosecutorial function. But nothing happened, so that's not actionable. And the repeated calls occur, nothing happens, so far that's not actionable. The only thing that becomes actionable is when he's terminated because the prosecutors say, we're not going to prosecute any cases. And that is a blanket prosecutorial decision, isn't it, subject to absolute immunity? I do not believe it is because you have to focus – the discussion in Roe focuses on the conduct of the prosecutor at all times. Yes, I get it. You didn't like my opinion in Roe very much. Well, no, Your Honor. That's okay. Actually – How do you distinguish Roe from this? Well, the question in Roe was posed solely as the question whether a prosecutor enjoys absolute immunity for a decision not to prosecute. Nowhere in the analysis in Roe does this decision grapple with the issue of the communications between the district attorney and the officer's employer. Roe does not hold that the communications between the DA and the employer are protected by absolute immunity. Nowhere. But at the end of the day, what Roe was claiming is that his job – he suffered an impairment of his ability to do a job, and he suffered an adverse employment consequence because the – and he said in retaliation for his First Amendment rights, the same claim is here. It's a different character of a claim. But in retaliation for the exercise of First Amendment rights, the prosecutor was not going to prosecute in cases. He suffered adverse employment consequences, and that fault was actual. And we said that decision, because it's a decision not to prosecute, is subject to absolute immunity. Isn't that really the essence of your claim here? Well, you know, in that decision, Your Honor, you relied a lot on Harrington versus – I'm sorry, versus Almay. And in that case, they specifically said, we're not addressing the issue of communications between the DA's office and the employer. That's a whole separate issue, and I urge you to revisit the holding in Roe and to look at it and to see how – and to see how the conduct of the DA in communicating with Mr. Botelho's employer in an effort to derail his employment for whistleblowing activity is separate. The DA could have simply announced a policy, said, okay, I'm not going to prosecute any of Mr. Botelho's cases. And it would have been fine had the cases come to his desk, as the court has held in Gensler. You know, the DA can't meddle with a case before it comes to his desk, or that is subject to qualified immunity. And – Well, can I just bring you back then so I get an answer to my question? The letter to Mr. Botelho terminating his employment said, that I must inform you that your employment as a probationary school police officer will be terminated on September 30, 2003. The district has an obligation to pursue criminal prosecution when appropriate, and as you are aware, the district attorney refuses to prosecute cases in which you would be a witness. Therefore, you are unable to perform an inherent part of the job of a school police officer. So where do we draw the line with that kind of evidence to say, where did the district attorney cross the line if he could adopt a policy that says, I won't prosecute, and the consequence of that is the school decides then, because of that, to fire him? Where is the nature of your claim? Where does it lie? The line is in the meddling with the employment. When the school district hired Mr. Botelho, they were aware of the non-prosecution policy. But what happened, and that letter occurred after the complaint, and this action was dismissed in this court. So the school district realized that it could no longer have Mr. Botelho working for them, because it was dismissed in this court and their hands were tied. But its position, and there were many things that were not recorded in the letters, came as a result of all the communications between the district attorney's office and the employer, urging them, pressuring them, to fire Mr. Botelho. The employer thought they could get around the decision by Mr. Gamak. They thought that Mr. Botelho could work on investigations and would not necessarily be a witness in a prosecution. There were many things Mr. Botelho could have done, but the district attorney kept communicating, kept calling the employer and spreading these falsehoods about Mr. Botelho. And I would submit that that is outside the scope of any prosecutions. Absolute immunity has never been seen as so expansive as to go outside the scope of pending prosecutions. And if you say that every communication a district attorney has with a police officer's employer regarding his employment in connection with a policy is subject to absolute immunity, you're giving him complete umbrella protection for all kinds of abuse. Well, the injury is simply he loses his job, and that could come about by the DA refusing to prosecute. Where is the injury in these earlier communications? The injury came from the pressure the DA exerted. So what is the injury to him? He loses his job, and you say he could lose his job if the DA refused to prosecute. So what do these injuries add up to? What are they? He lost his job. Well, you say he could do that because the DA could say I won't prosecute his cases. And the DA did more. But that doesn't add anything to the injury. The only injury is he loses his job. That's something the DA could accomplish. Why don't you contemplate that, and we'll give you two minutes for rebuttal. Thank you, Your Honor. We used up all of your time with our questions, so we'll make sure that you have ample time to respond. Thank you. May it please the Court, counsel, students, my name is Greg Shannon. I'm a Deputy District Attorney with the Washoe County District Attorney's Office, and I represent Mr. Gamak, the District Attorney, and Mr. Helzer, the Assistant District Attorney in Washoe County. It seems to me, if I could attempt to summarize counsel's position, that what she's saying is that the District Attorney has absolute prosecutorial immunity for making the decision not to prosecute cases, but he can't communicate that decision to anyone. If he does, he loses his immunity. Well, they did more than that in this case. I mean, what the DA did was to say don't hire this person. And that's something quite apart from making a decision not to prosecute. Even though I think the question, the tough question for Mr. Patello is how can you segregate the damages, but assuming that there are damages that flow from that independent communication, whether it be emotional stress damages or something else, that can't possibly be subject to immunity, can it? I don't think he can make that segregation. Everything flowed from the decision. All that Mr. Gamak was doing was communicating his decision to someone. So he wasn't telling someone not to hire somebody. And the letter that is in the opening brief that Judge Fischer just read from says that the reason that the District Attorney or the reason that the school district was terminating Mr. Patello was because of the decision of the District Attorney's office not to prosecute Mr. Patello's cases. Right. But then earlier than that, though, there were additional, there were communications that clearly didn't mention the decision not to prosecute him. I mean, there was, at least the allegations are, and we have to at this stage take the allegations that lie most favorable to the plaintiff. The allegations are that statements were made, don't hire this person. How can that be related to a prosecutorial decision? Because it stemmed from the prosecutorial decision not to prosecute. That's the only reason that there was any sort of a problem in the eyes of the District Attorney's office with this officer is that the District Attorney's office had made its own evaluation that he was not a witness that could be trusted on the witness stand. Well, he went beyond that. He didn't limit it to his being a witness. He said he wouldn't let him, he wouldn't prosecute any case in which he'd been involved in any way. How does that tie in? Well, it does tie in with the rationale of Roe, which builds off the judicial function connection of the prosecutorial decision. It's leaning more towards the time in which, as in the case of Roe, they wouldn't use him as a witness in court, but they would use him if his testimony or his, could be corroborated. Here you have a blanket prohibition on any case for any involvement whatsoever with no stated reason given. The letter that you just cited, which I had cited, says, look, we've never been given a reason by the DA even though we've asked for it. So how does that work into the prosecutorial function as opposed to getting over onto the administrative side where he's basically meddling in the investigative part of the process? Because it goes back to Your Honor's question about where do you draw the line. Where does the investigator have to hand off an investigation to someone else? You can't know in advance where the investigation is. That may be the policy, then. The policy can be announced that I won't prosecute any case in which the officer would have to testify. That could be the policy. That could be the announced policy. It could be communicated. But beyond, as Judge Thomas said, more than that is done here. Well, more than that was also done in the Roe case. I don't think so. A prosecutor in the Roe case told an internal affairs investigator that Roe would have to leave town. He'd have to get out of San Francisco. So that was clearly an interference in the job. That wasn't telling the employer to not hire somebody. I mean, it's up to the employer. It's up to the school district to decide whether or not they want him. And they made a decision, actually, to go ahead and hire him. And it was up to them. See, that's the thing that bothers me. Mr. Gamak may have said certain things, but it was the school district that made the decision, and they went ahead and hired him. All Mr. Gamak said was, if you hire him, we're not taking any of these cases. And so they went ahead and they did. They did, in fact, hire him. And apparently they waited until the district court, according to counsel here, until the district court ruled and then decided, well, I guess we can't keep Mr. Botello on. And they exercised their decision to terminate him. What if the prosecutor decided they didn't want to use or wouldn't prosecute any case because the officer in question, this is a hypothetical case, officer in question was African-American? Absolute immunity for that decision? Oh, I don't think so. I think that then you'd have serious problems. But I think the decision – Well, how do you actually distinguish it, though? Absolute immunity is absolute immunity. Because it has to be for a prosecutorial function, and that sort of a racist determination wouldn't be a legitimate exercise of the prosecutorial function. So you think if it's protectual, it's not protected? No, because I don't think I'm going that far in saying that, but I think that racial categorizations are a bright line, and it's very clear that that sort of thing is not in any way protected. How could it possibly be different from a First Amendment whistleblowing situation? I mean, if the exercise of the decision is purely protectual and covering up an invasion to fundamental rights, how can you say it's all right to discriminate on the – you can't discriminate on the basis of race, but you can discriminate on the basis of exercise of First Amendment rights? Well, I think that there's a whole analysis you go through in the whistleblowing, the First Amendment context to determine whether something is protectual or not. And so if it turns out to be protectual, then there is no protection. And so there is that analysis that goes on. But you don't even get there under absolute immunity. You're foreclosing that balancing. You might get it under qualified immunity. Qualified immunity for racial – Then you might get – Based on race. But you're saying absolute immunity. If the policy – if the only dispositive issue is a declared policy of the district attorney, I won't prosecute any case in which Officer Petello – read Officer Petello, it's black. Officer Petello is a woman. Officer Petello has political views, whatever protected ground. As I understand your argument, you get absolute immunity so long as it is couched as a prosecutorial decision. And yet the motivation may be absolutely discriminatory, a prohibited ground. And you're suggesting that if it's a racial ground that's driving it, that the motive of the decision not to use the officer is purely racial or purely sexist, nonetheless it's a prosecutorial prerogative and it's protected under both. Then maybe I'm wrong and maybe there is absolute immunity for racial discrimination. But I don't believe so. And I am aware that cases say that motivation is not to be considered when you're talking about immunity. But there still has to be an underlying basis, even if there's a motive that's based on animus or some improper purpose. Well, one of the differences between this case and Roe, and whether it's pivotal or not, I'm not sure. But the difference is that in Roe, we really determined that Roe was not exercising protected First Amendment speech. He was just sending citations. He claimed he was, but we said he wasn't. Here, the allegations are a lot stronger that this is a classic whistleblowing case. So that's a major distinction between the two cases. Do you think that's decisive or not? Well, in this case, there was no action whatsoever for any supposed whistleblowing activity. He engaged in the investigation that counsel refers to when he was a deputy sheriff at the Washington County Sheriff's Office. He resigned from the sheriff's office for unknown reasons. But counsel quotes another letter from the sheriff saying, you know, we think you're doing a fine job. We don't think you should resign. And there's no connection at all between any of his conduct as an investigator in those child sex abuse cases  only later when he went to work for the school district that the district attorney said, we're not taking any of your cases. For what reason? For what was the reason? For not taking any of his cases? I don't believe that that's been developed yet in this case. Well, does it not make a difference? It seems to me you're begging the question. Judge Thomas said, would there have to be a distinction between racial discrimination and First Amendment whistleblowing? He said, well, it wasn't whistleblowing. But we don't know that. If it was whistleblowing, what would your answer be? Well, that would be a cause of action. But I believe that there would still be immunity. I haven't seen any cases where there's been absolute prosecutorial immunity applied in the whistleblowing context. It's sort of a blending of a couple of different types of cases that don't usually come together. But I think that whistleblowing would raise a cause of action under Section 1983, but there would be absolute immunity for it as long as the prosecutor's decision related to his prosecutorial function. Even if it was retaliation for whistleblowing? Well, retaliation is caused by an employer. And there was no employer-employee relationship here. He was terminated by the school district. And the school district said, as Your Honor read, that it was because of the decision not to prosecute. So that was not – there was no retaliation in his termination. And I would just like to clarify one thing, because I'm not sure if this is clear to the Court from the briefing, but the Washoe County School District is a completely separate legal entity from Washoe County. They have a different board. They're a completely separate political subdivision. So it's not like there's any sort of employer-employee relationship at all between them and Washoe County. So you don't think an inference can be drawn that the motive for writing the school board was displeasure and is whistleblowing? Well, I know that that's the inference that the plaintiff is attempting to draw, but whistleblowing occurs in the context of an employer-employee relationship, from my understanding, and the retaliation would be the termination. Well, it can be enlarged. It doesn't have to be strictly that way. Well, I understand that it can be enlarged, but this would be enlarging it to just, I think, beyond the breaking point, because the person who did the terminating did so for no retaliatory purpose at all, and the purpose that even that employer cited to is protected. Well, it's a peculiarly vicious form of retaliation if the former employer can pursue the ex-employee and get him to lose another job. But a prosecutor has to have the ability to make the decision whether he's going to evaluate. Well, suppose he's got a bad motive. He's punishing someone for exercising his First Amendment rights. You conceded it on race and sex. What's different about the First Amendment? Well, you know, the... What's different? I conceded that I may have also been wrong, but the... You said racial and sex firing would be okay. You're going to retract on that. I said for racial discrimination. All right. Are you retracting on that now or not? I'm saying that I didn't think about that prior to coming to this because of what... Well, think about it now. What's your answer? My answer is that motive plays no part in the immunity analysis. As long as that's... As I've said many times. Yes. Go right down the line. Yes. If the court wants me to draw a line, that's the line. There's a count here for defamation. Is it your contention that if a prosecutor says, calls another... calls a subsequent employer and said, I'm not going to prosecute any cases brought by this officer, and by the way, here's why, and then makes what would otherwise be defamatory statements, that the absolute immunity afforded decision not to prosecute provides absolute immunity for the defamatory statements? Well, ordinarily we have to know what the defamatory statements are. Well, this is hypothetical. I understand. I would say that immunity probably trumps the defamation claim. There's also a separate line of immunity for speaking to employers. There's that separate line. Right. But that's not the one that's at issue here. No, that's true. Yeah. Thank you. Yeah. Thank you very much, counsel. We'll give you two minutes for rebuttal. Yes, Your Honor. I just wanted to mention in Doe v. Phillips, 81F3D1204, the appellate court, Second Circuit, denied absolute immunity to a prosecutor who, in the course of a criminal prosecution, demanded the plaintiff swear to her innocence on a Bible. First Amendment conduct, no absolute immunity. In Harris v. Harvey, 605F2D330, the court rejected a judge's claims to absolute immunity for interfering with the employment relationship of an African-American police officer by urging the city to fire him. So there are two situations, First Amendment and race, in which absolute immunity is denied in the context of a court proceeding. Now, I want to say I'm perhaps misspoke. I don't believe that there is blanket immunity for everything the prosecutor did in this case. It went far beyond the decision to not use Mr. Botello as a witness. As you pointed out, Judge Fischer, in the Roe case, they decided not to take cases that were not corroborated by Roe. They did not interfere with the investigations of that officer at the beginning. They didn't interfere. They just said they would not take cases that were not corroborated by Roe. Now, a prosecutor is obligated to take a case as it lands on his desk. He's not allowed to wrap himself in the cloak of absolute immunity to interfere with prosecutions from their very beginning. That's unheard of, and it would go far beyond what Roe said, far beyond what any case has said. Now, in the Court's recent decision in Caballos, the Court found, and I believe you, Judge Fischer, were on that panel, that a DA's conduct in deciding to preclude an assistant DA from prosecuting future cases was not protected conduct. Just so. The Supreme Court, in its wisdom, has decided to take that on certiorari. Hold your breath. Sometimes the cases fall your way. Sometimes they don't. Well, for now. I'm sure they liked it so much they want to make it national precedent. Just because Judge Reinhart wrote it. Well, what the DA did in this case, which is similar to Caballos, is he precluded Mr. Botelho from participating in any investigation from the inception. It has nothing to do with his being a witness. The DA has to accept a case at his desk. Now, if the Washoe County School District, Mr. Botelho's employer, believed that Mr. Botelho could participate in an investigation because of his integrity, his skills, et cetera, and put it on the desk of the DA, that was their prerogative. And they did that for a year until they were hired. So an officer has been found to have perjured himself. Pardon? If an officer is found to have perjured himself, they have to take all of his cases, regardless of that, if there's some protected right involved. The prosecutor cannot make a decision that I'm not going to prosecute cases involving this officer. Oh, absolutely not, Your Honor. But that is part of the system. That comes on his desk, and the prosecutor can say, I'm not taking that case. But in Roe, there were no pending cases. They made the decision on a blanket basis. We're not going to take the – we're going to use this officer as a witness. They said because we think he perjured himself. He said because it's retaliation. And we said, well, you can make a blanket decision, and that's protected. How is this different? Well, I read Roe a thousand times, Your Honor, and I tried to figure whether it was in the context of a pending case or not and could not figure that out. But what was clear was Roe did not grapple with the issue of whether it was a pending case or whether it was a case that was, you know, not pending or, you know, what was the situation in which those communications took place. And the cases that Roe relied on also did not grapple with that issue. Well, they told him he had to get a job elsewhere and that no prosecutions were going to occur. Although, you know, that's a fairly strong communication of future intent, I would say. And again, Roe is distinguished from this case. It's not a whistleblower case. It wasn't a blanket prohibition of the officer from investigating cases or even from testifying where his testimony was corroborated. I think we have your argument in hand. Thank you both for your arguments this morning and for coming to Berkeley today to do it. It's always a little bit difficult to argue in front of a law school audience, but you both did exceptionally well. Thank you. Thank you, Your Honor. Proceed with the next case.
judges: Noonan, Thomas, Fisher